**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

COMMON CAUSE GEORGIA
250 Georgia Ave SE #305
Atlanta, GA 30312,

TREAUNNA C. DENNIS
250 Georgia Ave SE #305
Atlanta, GA 30312
                    Plaintiffs,

v.                                                    Civil Action No. 1:22-cv-3067

FEDERAL ELECTION COMMISSION
1050 First Street NE
Washington, DC 20463,
                    Defendant.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1.      This lawsuit challenges the Federal Election Commission's ("FEC" or "Commission") unlawful dismissal of allegations involving illegal undisclosed contributions and coordination to influence the 2021 U.S. Senate runoff election in Georgia. As detailed in an administrative complaint filed by Common Cause Georgia, Treaunna C. Dennis, and Campaign Legal Center Action, *see* Ex. 1, Admin. Compl., MUR 7894 (Mar. 31, 2021), https://www.fec. gov/files/legal/murs/7894/7894_01.pdf,[1] True the Vote, a section 501(c)(3) nonprofit corporation, and the Georgia Republican Party ("Georgia GOP" or "party") violated federal campaign finance law when, at the Georgia GOP's explicit request, the two entities entered into a self-described partnership in which True the Vote provided the party with a variety of election-related services during the runoff election that the party neither paid for nor disclosed as in-kind contributions. The FEC's nonpartisan, career attorneys recommended finding "reason to believe" that True the Vote

---

[1]  The administrative complaint is attached hereto as Exhibit 1. Other documents in the MUR file are available on the FEC's website, at https://www.fec.gov/data/legal/matter-under-review/7894.

and the Georgia GOP violated federal campaign finance laws, but the Commission unjustifiably rejected its lawyers' recommendations and dismissed the allegations rather than investigate them.

2.      Plaintiffs Common Cause Georgia and Treauuna C. Dennis thus bring this action for declaratory and injunctive relief against the FEC pursuant to 52 U.S.C. § 30109(a)(8), challenging as contrary to law the FEC's dismissal of their administrative complaint against True the Vote and the Georgia GOP (collectively, "respondents") for violations of the Federal Election Campaign Act ("FECA" or "Act") during the 2021 U.S. Senate runoff election in Georgia.

3.      The administrative complaint—filed with the FEC on March 31, 2021 by Common Cause Georgia, Treauuna C. Dennis, and Campaign Legal Center Action, and designated Matter Under Review ("MUR") 7894—alleged that True the Vote's spending for what it called "election integrity initiatives" in connection with the Georgia runoff elections violated federal campaign finance laws. In particular, the complainants alleged that True the Vote's election activities were undertaken in partnership with and at the request of the Georgia GOP, causing True the Vote to violate 52 U.S.C. § 30118 by making prohibited corporate in-kind contributions to the Georgia GOP in the form of coordinated expenditures, and the Georgia GOP to violate 52 U.S.C. § 30118(a) and 52 U.S.C. § 30104(b)(3)(A) by knowingly accepting such prohibited contributions and failing to disclose them. Admin. Compl. ¶¶ 9-16.

4.      Drawing on publicly available information including public statements from both True the Vote and the Georgia GOP, the administrative complaint detailed how True the Vote had received a "request" from the Georgia GOP for assistance with the 2021 Georgia Senate runoff election and announced via press release a "partnership" with the party to provide a variety of services in connection with the election, including a voter hotline, ballot-curing support, signature verification training, absentee ballot drop box monitoring, and "other election integrity initiatives,"

Admin. Compl. ¶¶ 9-11—and how, days after announcing this partnership, True the Vote had implemented eligibility challenges to over 364,000 Georgia voters. *Id.* ¶ 15.

5.      The administrative complaint asked the Commission: (1) to find reason to believe (a) that True the Vote made prohibited corporate in-kind contributions to the Georgia GOP in the form of coordinated expenditures, in violation of 52 U.S.C. § 30118, 11 C.F.R. § 114.2(a), and 11 C.F.R. § 114.10, and (b) that the Georgia GOP knowingly accepted those in-kind contributions and failed to report them, in violation of FECA's prohibition on corporate contributions to a party committee, 52 U.S.C. § 30118(a), and its disclosure requirements, 52 U.S.C. § 30104(b)(3)(A); (2) to conduct an immediate investigation under 52 U.S.C. § 30109(a)(2); and (3) to seek appropriate sanctions. Admin. Compl. ¶¶ 37, 40-42.

6.      Upon evaluating the complaint and responses, the FEC's nonpartisan Office of General Counsel ("OGC") recommended that the Commission find "reason to believe" respondents violated the Act and initiate an investigation to determine the scope of that violation, including the extent of illegal and undisclosed contributions resulting from their coordinated activities. First Gen. Counsel's Report ("OGC Report") at 22, MUR 7894 (Dec. 9, 2021), https:// www.fec.gov/files/legal/murs/7894/7894_14.pdf.

7.      Despite OGC's recommendations, the Commission failed, by a vote of 2-3 with one Commissioner recused, to muster the four affirmative votes needed to find reason to believe and proceed with an investigation into the alleged FECA violations. Certification, MUR 7894 (Aug. 11, 2022), https://www.fec.gov/files/legal/murs/7894/7894_15.pdf. The Commission subsequently voted 4-2 to close the file, dismissing the complaint. *See id.* at 2.

8.      Two of three Commissioners who voted against OGC's reason-to-believe recommendations subsequently issued a "Statement of Reasons" explaining the basis for their

votes. *See* Statement of Reasons of Chairman Allen J. Dickerson and Commissioner James E. "Trey" Trainor, III ("Dickerson & Trainor Statement"), MUR 7894 (Sept. 13, 2022), https://www. fec.gov/files/legal/murs/7894/7894_20.pdf.

9.     The FEC's failure to find reason to believe and consequent dismissal of plaintiffs' administrative complaint, as explained in these two Commissioners' Statement of Reasons, rested on impermissible interpretations of the Act and was arbitrary, capricious, and otherwise contrary to law. *See Orloski v. FEC*, 795 F.2d 156, 161 (D.C. Cir. 1986).

10.     Although the Supreme Court has found that truly independent expenditures may not "pose dangers of real or apparent corruption," it has repeatedly recognized that *coordinated* expenditures function as "disguised contributions"—and that the failure to regulate them as such creates an acute risk of corruption and deprives the public of valuable information about the true sources of candidates' and parties' financial support. *Buckley v. Valeo*, 424 U.S. 1, 46-47 (1976) (per curiam).

11.     The dismissal of plaintiffs' administrative complaint has undermined FECA's purposes, including its goals of preventing the corruptive effects of "disguised" contributions and providing the electorate with comprehensive disclosure "as to where political campaign money comes from and how it is spent." *Buckley*, 424 U.S. at 66 (quoting H.R. Rep. No. 92-564, at 4 (1971)). Compounding the damage to the Act's anticorruption and transparency purposes, as well as to plaintiffs' informational interests under FECA, the dismissal encourages political parties and candidates to seek to evade FECA's contribution restrictions and disclosure requirements in future elections by similarly "partnering" with corporate entities to furnish desired campaign services and coordinate spending.

12.     Plaintiffs have suffered as a result of the Commission's failure to enforce FECA's contribution restrictions and disclosure requirements. The dismissal has deprived both plaintiffs, as well as Common Cause's more than 25,000 members and supporters in Georgia, of statutorily mandated disclosure information upon which Common Cause Georgia relies to complete its work and advance its mission and that Ms. Dennis and Common Cause's voting members need to properly evaluate candidates for office and to cast informed votes.

13.     Plaintiffs therefore respectfully request a judicial declaration that the FEC's dismissal of their administrative complaint was arbitrary, capricious, and contrary to law, and an order requiring the FEC to conform with such declaration within 30 days.

## JURISDICTION AND VENUE

14.     This Court has both subject matter jurisdiction over this action and personal jurisdiction over the parties pursuant to 52 U.S.C. § 30109(a)(8)(A). This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1331.

15.     Venue in this district is proper under 52 U.S.C. § 30109(a)(8)(A) and 28 U.S.C. § 1391(e).

## THE PARTIES

16.     Plaintiff Common Cause Georgia is a state office of Common Cause, a nonprofit, nonpartisan organization with more than 1.5 million members and supporters nationally and more than 25,000 members and supporters in Georgia. Common Cause uses litigation, public education, and grassroots advocacy to uphold the core values of American democracy. Common Cause works to create open, honest, and accountable government that serves the public interest; promote equal rights, opportunity, and representation for all; and empower all people to make their voices heard

in the political process. Transparency of money in politics and enforcement of campaign finance laws is crucial to advancement of Common Cause's mission.

17.     Common Cause Georgia relies on the accurate and complete reporting of campaign finance information to carry out activities central to its mission, including public education and research about the true sources and scope of political campaign spending. These activities—which help equip Common Cause Georgia members, as well as the public, with the information necessary to evaluate different candidates and electoral messages and to cast informed votes—are obstructed when information that is subject to mandatory disclosure under FECA is not publicly available.

18.     The FEC's failure to enforce the law has also concretely impaired Common Cause Georgia's efforts to protect and expand voting rights for all eligible Georgians and to empower citizens through public education—activities central to its organizational mission of strengthening public participation in the democratic process and creating open, honest, and accountable government. In particular, the Commission's failure to enforce FECA's prohibition on corporate contributions to party committees against True the Vote, a nonprofit corporation that seeks to "protect election integrity" through, *inter alia*, voter challenges, has directly harmed Common Cause Georgia's voter protection work.  To counteract that harm, plaintiff has been forced to divert resources from other organizational needs.

19.     Plaintiff Treaunna C. Dennis is the executive director of Common Cause Georgia and a registered voter in Fulton County, Georgia.

20.     As a registered voter, Ms. Dennis is entitled to receive all the information FECA requires those engaged in political activities to report publicly, and her informed exercise of the vote is impaired when such information is unavailable.

21.     The FEC's failure to require the Georgia GOP to disclose any contribution or expenditure information in connection with the coordinated activities it undertook with True the Vote, including the dates, amounts, and purposes of each in-kind contribution resulting from the respondents' self-described partnership, deprived both plaintiffs of campaign finance disclosure information that they have a statutory right to access and that Ms. Dennis and Common Cause Georgia's members use to evaluate candidates for federal office.

22.     Defendant FEC is an independent federal agency charged with the administration and civil enforcement of FECA. 52 U.S.C. § 30106.

## STATUTORY AND REGULATORY BACKGROUND

23.     FECA and Commission regulations broadly prohibit corporations from making contributions to federal political committees (other than to super PACs or "hybrid" committees[2]). 52 U.S.C. § 30118; 11 C.F.R. § 114.2(a).

24.     For purposes of the corporate contribution ban, both "contribution" and "expenditure" are defined as "any direct or indirect payment, distribution, loan, advance, deposit, or gift of money, or any services, or anything of value . . . in connection with any election." 11 C.F.R. § 114.1(a)(1).

25.     A corporate expenditure made in coordination with a party committee—*i.e.*, "in cooperation, consultation, or concert, with, or at the request or suggestion of" the party or its agents—is a prohibited in-kind contribution to that party committee. 52 U.S.C.

---

[2] In 2011, pursuant to the stipulated order and consent judgment in *Carey v. FEC*, 791 F. Supp. 2d 121 (D.D.C. 2011), the Commission issued guidance allowing for "hybrid" committees that make both independent expenditures and campaign contributions from segregated accounts. FEC Statement on *Carey v. FEC*, Reporting Guidance for Political Committees that Maintain a Non-Contribution Account (Oct. 5, 2011), https://www.fec.gov/updates/fec-statement-on-carey-fec.

§ 30116(a)(7)(B)(i); 11 C.F.R. § 109.20; *see also* 11 C.F.R. § 114.10 ("[C]orporations . . . are prohibited from making coordinated expenditures as defined in 11 CFR 109.20.").

26.     Political committees are prohibited from knowingly accepting or receiving corporate contributions. 52 U.S.C. § 30118; 11 C.F.R. § 114.2(d). Corporate officers and directors are also prohibited from consenting to such prohibited contributions. 52 U.S.C. § 30118(a); 11 C.F.R. § 114.2(e).

27.     The Commission has emphasized that "payments which are coordinated with candidates constitute expenditures and in-kind contributions to those candidates even if the communications do not contain express advocacy." FEC, Corporate and Labor Organization Activity; Express Advocacy and Coordination With Candidates, 64 Fed. Reg. 65211, 64262 (Dec. 14, 1995). "A corporation or labor organization that engages in election-related activities directed at the general public must avoid most forms of coordination with candidates, as this will generally result in prohibited in-kind contributions, and will compromise the independence of future communications to the general public." *Id.* at 64263.

28.     In 2014, following *Citizens United v. FEC*, 558 U.S. 310 (2010), the Commission updated its regulations to reflect that the Supreme Court had permitted corporations to make unlimited independent expenditures, yet in doing so emphasized that "the holding in *Citizens United* applies to all corporate and labor organization expenditures *that are not coordinated* and do not otherwise constitute in-kind contributions." FEC, Independent Expenditures and Electioneering Communications by Corporations and Labor Organizations, 79 Fed. Reg. 62797, 62804 (Oct. 21, 2014) (emphasis added).

29.     Among other things, the Commission in 2014 revised 11 C.F.R. § 114.4(c), which governs corporate communications to the general public in connection with a federal election, to

remove the pre-*Citizens United* prohibition on express advocacy, but to add "an explicit prohibition on corporations and labor organizations coordinating with candidates or party committees, pursuant to the Commission's coordination regulations, on communications to the general public." *Id.* at 62805.

30.     The corporate communications regulated by 11 C.F.R. § 114.4(c) include the distribution of voter registration or get-out-the-vote ("GOTV") communications, 11 C.F.R. § 114.4(c)(2)(ii), (c)(2)(ii)(B), and of registration or voting information produced by official election administrators, *id.* § 114.4(c)(3)(i), (c)(3)(iv)(B). In promulgating the 2014 revisions, the Commission emphasized that it was "removing the prohibitions on express advocacy in 11 CFR 114.4(c)(2)–(6) but continuing the prohibition on corporations and labor organizations coordinating with any candidate or political party in making these communications." 79 Fed. Reg at 62806-07. Towards that end, the Commission added at 11 C.F.R. § 114.4(a)(1) "a general prohibition on corporations or labor organizations acting in cooperation, consultation, or concert with or at the request or suggestion of a candidate, a candidate's committee or agent, or a political party committee or its agent regarding the preparation, content, and distribution of any of the specific types of communications" described in 11 C.F.R. § 114.4(c)(2)–(6).

31.     11 C.F.R. § 114.4(a)(1) now provides that "[t]he preparation, contents, and distribution of any of the communications described in paragraphs (2) through (6) below must not include coordinated expenditures as defined in 11 CFR 109.20, coordinated communications as defined in 11 CFR 109.21, or contributions as defined in 11 CFR part 100, subpart B."

32.     Accordingly, a corporation that makes voter registration or get-out-the-vote communications to the general public makes a contribution when the distribution of those communications is coordinated with a political party. 11 C.F.R. § 114.4(c)(2)(ii), (c)(2)(ii)(B).

33. A corporation that distributes any "registration or voting information, such as instructional materials, that has been produced by the official election administrators" makes a contribution if the reproduction and distribution of the materials is coordinated with a political party. 11 C.F.R. § 114.4(c)(3)(i), (c)(3)(iv)(B).

34. In its 2014 rulemaking, the Commission also emphasized that corporations may not coordinate with a candidate or political party regarding non-communication expenditures, such as expenditures for the voter registration and GOTV drives described in 11 C.F.R. § 114.4(d). "Revised 11 CFR 114.4(a) also states that voter registration and GOTV drives, further addressed in paragraph (d), may not include coordinated expenditures, coordinated communications, or contributions, as those terms are defined in Commission regulations. This language is meant to indicate that corporations and labor organizations remain prohibited from making contributions under the Act and Commission regulations." 79 Fed. Reg. at 62805. Accordingly, a corporation that "support(s) or conduct(s)" a voter registration or get-out-the-vote drive in coordination with a political party makes a contribution to the committee. *See* 11 C.F.R. § 114.4(d)(1), 114.4(a) ("Voter registration and get-out-the-vote drives as described in paragraph (d) of this section must not include coordinated expenditures as defined in 11 CFR 109.20.").

35. FECA and Commission regulations require all federal political committees to file periodic reports accurately disclosing their receipts, disbursements, and debts and obligations, including in-kind contributions in the form of coordinated expenditures. 52 U.S.C. § 30104(a)(1).

36. Political committees must report all contributions over $200 received from persons other than political committees, together with the dates and amounts of such contribution. 52 U.S.C. § 30104(b)(3)(A).

*Governing Administrative and Judicial Process*

37.     Any person may file a complaint with the FEC alleging a violation of FECA. 52 U.S.C. § 30109(a)(1). FEC regulations specify, in relevant part, that a complaint must identify the complainants and be sworn and signed, and that the allegations in a complaint "not based upon personal knowledge" should identify the source of the information that "gives rise to the complainant's belief in the truth of such." 11 C.F.R. § 111.4(b), (d).

38.     The Commission, after reviewing the complaint and any responses, then votes on whether there is "reason to believe" a violation has occurred, in which case it "shall" investigate. 52 U.S.C. § 30109(a)(2). FECA requires the FEC to find "reason to believe" by at least four affirmative votes of the six members of the Commission. *Id.*

39.     The Commission will find reason to believe where a complaint "credibly alleges" that a FECA violation "may have occurred." FEC, Statement of Policy Regarding Commission Action in Matters at the Initial Stage in the Enforcement Process, 72 Fed. Reg. 12545 (Mar. 16, 2007).

40.     Any "party aggrieved" by the Commission's dismissal or failure to act upon an administrative complaint may seek judicial review in the U.S. District Court for the District of Columbia. 52 U.S.C. § 30109(a)(8)(A).

## FACTUAL BACKGROUND

*Plaintiffs' Administrative Complaint against True the Vote and the Georgia GOP*

41.     On March 31, 2021, Common Cause Georgia, Treaunna C. Dennis, and Campaign Legal Center Action filed an administrative complaint with the FEC against True the Vote and the Georgia Republican Party. *See* Ex. 1, Admin. Compl., MUR 7894 (Mar. 31, 2021). The complaint alleged that True the Vote's spending for certain election-related activities in connection with the

2021 Georgia runoff elections was undertaken in "partnership" with and at the "request" of the Georgia GOP, causing True the Vote to violate 52 U.S.C. § 30118 by making prohibited corporate in-kind contributions to the Georgia GOP in the form of coordinated expenditures, and the Georgia GOP to violate 52 U.S.C. § 30118(a) and 52 U.S.C. § 30104(b)(3)(A) by knowingly accepting such prohibited contributions and failing to disclose them. Admin. Compl. ¶¶ 9-16.

42.    The FEC designated the matter initiated by the administrative complaint as MUR 7894.

43.    As noted in the administrative complaint, True the Vote is a nonprofit 501(c)(3) corporation founded in 2009, and described itself on its website as "the country's largest voters' rights organization and well known for our ability to lead unified national plans to protect election integrity." Admin. Compl. ¶ 7 (quoting True the Vote, Mission, https://truethevote.org/mission).

44.    The administrative complaint relied on publicly available information, including press releases and statements from both respondents, to document how True the Vote responded to the Georgia GOP's "request" for assistance in the 2021 runoff election by "partnering" with the party to provide various election-related services and otherwise coordinate such activities on the party's behalf. *See* Admin. Compl. ¶¶ 9-12.

45.    For example, the complaint pointed to a December 14, 2020 email from True the Vote founder and president Catherine Engelbrecht to supporters in which she wrote that the organization had received "a request from the Georgia Republican Party" for assistance:

> For the past two weeks, I've been in Georgia with a small team from True the Vote, working on specific, tangible ways to help ensure transparency and accuracy in the critical run-off elections that will determine the balance of power in the Senate. We've met with voters and state leaders, leading ultimately to a request from the Georgia Republican Party to provide publicly available nonpartisan

> signature verification training, a 24x7 voter hotline, ballot-curing
> support, and more.

Admin. Compl. ¶ 9 (citing Email from True the Vote, *Weekly Update | Validate the Vote GA |*
*12.13.20* (Dec. 14, 2020, 12:26am), https://politicalemails.org/messages/318884). Engelbrecht's
email concluded with a fundraising appeal pledging that any donations received in response "will
be used to fund the work in Georgia." *Id.*

46.     The complaint also described a press release that True the Vote issued later that
same day touting its "partnership" with the Georgia GOP. *See* Admin. Compl. ¶¶ 10-12 (citing
Press Release, True the Vote, *True the Vote Partners With Georgia GOP to Ensure Transparent,*
*Secure Ballot Effort for Senate Runoff Elections* (Dec. 14, 2020), https://truethevote.org/true-the-
vote-partners-with-georgia-gop-to-ensure-transparent-secure-ballot-effort-for-senate-runoff-
elections). In this December 14, 2020 press release, True the Vote:

> a.  Announced its "partnership with the Georgia Republican Party to assist with the
>     Senate runoff election process, including publicly available signature verification
>     training, a statewide voter hotline, monitoring absentee ballot drop boxes, and other
>     election integrity initiatives" while highlighting dates relevant to voting in the
>     upcoming runoff election, *id.* ¶ 10;
>
> b.  Included a direct quote from Georgia Republican Party Chairman David Shafer
>     noting that the party was "grateful for the help of the True the Vote team in the fight
>     for election integrity," and further avowing: "The resources of True the Vote will
>     help us organize and implement the most comprehensive ballot security initiative
>     in Georgia history," *id.* ¶ 11; and
>
> c.  Quoted Engelbrecht as saying: "We have focused our 'Eyes On Georgia' in these
>     critical final days before the runoff, and we are thrilled to partner with the Georgia

13

Republican Party, Chairman Shafer, and his team to ensure the law is upheld and law-abiding voters have their voices heard." *Id.* ¶ 12.

47.    As the administrative complaint further detailed, the December 14, 2020 press release was apparently altered over the ensuing weeks to state that True the Vote had "offer[ed] to extend the same support to the Georgia Democratic Party" but received no response.[3]

48.    Three days after announcing its partnership with the Georgia GOP, True the Vote challenged the eligibility of more than 360,000 Georgia voters. *See* OGC Report at 5-6.[4]

49.    According to the Georgia Republican Party's publicly filed FEC disclosure reports, the party has not disclosed any contributions received from True the Vote,[5] nor payments to True the Vote for services.[6]

---

[3] *See* Admin. Compl. ¶¶ 13-14 (citing Press Release, True the Vote, *True the Vote Partners With Georgia GOP to Ensure Transparent, Secure Ballot Effort for Senate Runoff Elections* (Dec. 14, 2020) (Dec. 14, 2020), *archived at* https://web.archive.org/web/20201214222722/https://truethevote.org/true-the-vote-partners-with-georgia-gop-to-ensure-transparent-secure-ballot-effort-for-senate-runoff-elections; Letter from Catherine Engelbrecht, True the Vote Founder, to Senator Nikema Williams, Democrat [sic] Party of Georgia (Dec. 20, 2020), *archived at* https://web.archive.org/web/20210429034522/https://truethevote.org/wp-content/uploads/True-the-Vote-Letter-to-GA-Democrat-Party-12-20-2020-Partnership.pdf).

[4] *See also* Admin. Compl. ¶ 15 (citing Bill Barrow, *GOP Activist's Voter Challenges Raise Questions in Georgia*, Associated Press (Dec. 22, 2020), https://apnews.com/article/georgia-elections-political-organizations-voter-registration-atlanta-3a8989df44c323ce798e0a5d34eb 9876; Mark Niesse, *Eligibility of 364,000 Voters Challenged Before Senate Runoff*, Atlanta Journal-Constitution (Dec. 22, 2020), https://www.ajc.com/politics/eligibility-of-364000-georgia-voters-challenged-before-senate-runoff/3UIMDOVRFVERXOJ3IBHYWZBWYI).

[5] *See* Admin. Compl. ¶ 16; Georgia Republican Party, Individual Contributions from "True the Vote," 2019-21, FEC, https://www.fec.gov/data/receipts/?data_type=processed&committee_id= C00150672&contributor_name=True+the+Vote&two_year_transaction_period=2020& two_year_transaction_period=2022 (last visited Oct. 4, 2022) (showing no contributions from True the Vote to the Georgia Republican Party).

[6] *See* Admin. Compl. ¶ 16; Georgia Republican Party, Disbursements to "True the Vote," 2019-21, FEC, https://www.fec.gov/data/disbursements/?data_type=processed&committee_id= C00150672&recipient_name=True+the+Vote&two_year_transaction_period=2020&two_year_ transaction_period=2022 (last visited Oct. 4, 2022) (showing no disbursements to True the Vote from the Georgia Republican Party).

***True the Vote and the Georgia GOP Respond to the Administrative Complaint***

50.     True the Vote and its president, as well as the Georgia GOP and its chairman, filed separate responses to plaintiffs' administrative complaint with the Commission on June 9 and July 12, 2021. *See* Response from True the Vote, Inc. and Catherine Engelbrecht ("TTV Response"), MUR 7894 (June 9, 2021), https://www.fec.gov/files/legal/murs/7894/7894_12.pdf; Response from Georgia Republican Party, Inc. and David Shafer ("Georgia GOP Response"), MUR 7894 (July 12, 2021), https://www.fec.gov/files/legal/murs/7894/7894_13.pdf.

51.     Respondents generally denied the allegations in the administrative complaint. In its response, True the Vote argued that its activities were not "expenditures" under FECA because protecting election integrity is a non-partisan activity and its efforts were not undertaken "for the purpose of influencing a federal election." TTV Response at 6-7. Both respondents also claimed that True the Vote had not provided anything of value to the party because its trainings and election resources were publicly available, *id.* at 8; Georgia GOP Response at 2-3, and that the groups had not coordinated despite announcing their "partnership" after the Georgia GOP's "request" for help in the runoff election, TTV Response at 10-11; Georgia GOP Response at 2.

52.     True the Vote's response also attached a Declaration from Engelbrecht acknowledging that True the Vote met with the Georgia GOP in December 2020 and thereafter issued a press release and email touting the groups' partnership. Engelbrecht Decl. ¶¶ 9-12.

***OGC Recommends Finding Reason to Believe that Respondents Violated FECA***

53.     Based on plaintiffs' administrative complaint and the respondents' written responses, the FEC's Office of General Counsel recommended that the Commission find reason to believe respondents violated the Act and initiate an investigation to determine the scope of that violation, including the extent of illegal and undisclosed contributions resulting from their

coordinated activities. OGC Report at 2, MUR 7894 (Dec. 9, 2021), https://www.fec.gov/files/legal/murs/7894/7894_14.pdf.

54.  Specifically, OGC recommended that the Commission find reason to believe that:

(1) True the Vote violated 52 U.S.C. § 30118(a) and 11 C.F.R. § 114.2(b) by making prohibited in-kind corporate contributions;

(2) Catherine Engelbrecht in her role as president of True the Vote violated 52 U.S.C. § 30118(a) and 11 C.F.R. § 114.2(e) by consenting to the making of prohibited in-kind corporate contributions;

(3) The Georgia Republican Party, Inc. and Joseph Brannan in his official capacity as treasurer violated 52 U.S.C. § 30118(a) and 11 C.F.R. § 114.2(d) by knowingly accepting prohibited in-kind corporate contributions; and

(4) The Georgia Republican Party, Inc. and Joseph Brannan in his official capacity as treasurer violated 52 U.S.C. § 30104(b) and 11 C.F.R. § 104.3(a) and (b) by failing to report receipts and disbursements to the Commission.

OGC Report at 22. OGC further recommended taking no action at that time with regard to the allegation that David Shafer, as Chairman of the Georgia GOP, violated 52 U.S.C. § 30118(a) and 11 C.F.R. § 114.2(d) by knowingly accepting prohibited in-kind corporate contributions. *Id.*

55.  In its report accompanying this recommendation, OGC surveyed relevant statutory and regulatory provisions, Commission precedent, and the available evidence and ultimately concluded that True the Vote had "provided services to the Georgia GOP by researching and implementing ballot challenges at the request of and in partnership with the Georgia GOP," OGC Report at 3, and that such services "should have been treated like services from any other vendor" and either paid for at their fair market value or reported as in-kind contributions, *id.* at 18-19. Because the respondents had done neither, there was reason to believe that True the Vote, Engelbrecht, and the Georgia GOP had violated FECA by respectively making, consenting to, and knowingly accepting prohibited corporate in-kind contributions, *id.* at 19, and that the Georgia

16

GOP had violated the Act by failing to disclose any of the in-kind contributions it received "in connection with its self-described partnership with True the Vote," *id.* at 20.

56.     OGC notably arrived at this conclusion based on the "unrebutted public statements from True the Vote and Georgia GOP officials" described in plaintiffs' administrative complaint "as well as True the Vote's own explanation of a meeting with the Georgia GOP." OGC Report at 3. *See also id.* at 12-13 (stressing that, "in True the Vote's *own words*," its "activity followed a consultation with and then a request from a political party committee" and was avowedly undertaken "to 'assist' that political party committee" (emphasis added)).

57.     In evaluating the matter, OGC highlighted two key considerations in its analysis: whether the available information was sufficient to provide reason to believe that True the Vote's activities were "coordinated" with the Georgia GOP, *i.e.*, were undertaken "in cooperation, consultation or concert with, or at the request or suggestion" of the Georgia GOP or its agents, OGC Report at 12-16; and if so, whether True the Vote's payments for these coordinated activities were "expenditures" as defined in FECA, *i.e.*, were made "for the purpose of influencing" the Georgia Senate runoff election, *id.* at 17-18.

58.     *First*, because True the Vote had publicly announced receiving a "request" from the Georgia GOP to "assist" with the Georgia runoff election and expressly "characterized the endeavor as a 'partnership,'" OGC concluded that the record was more than sufficient to show coordination between the two entities. OGC Report at 11-12. OGC also highlighted that the declaration submitted in response to the administrative complaint by True the Vote's president, Catherine Engelbrecht, expressly acknowledged that True the Vote met with the Georgia GOP, discussed its Georgia operations with the party, and received the party's imprimatur to continue them—further indicating that True the Vote had "consulted the Georgia GOP in connection with

its intended activity in Georgia" and sought the party's "input" regarding those activities. *Id.* at 16. Finally, OGC noted evidence "suggesting active cooperation between the two groups beyond their initial discussions," *id.* at 15, "indicat[ing] the presence of both a request from the Georgia GOP and subsequent cooperation between the two entities," *id.*

59.     In finding sufficient reason to believe True the Vote and the Georgia GOP had coordinated their activities, OGC rebuffed True the Vote's arguments to the contrary based on the asserted absence of an "official" partnership or "joint venture" with the party, "substantial discussions between the groups," or proof that the Georgia GOP had exerted "control" over True the Vote's activities. OGC Report at 2. In particular, OGC stressed that regardless of True the Vote's claim that its use of the words "partner" and "partnership" was "meaningless," "[t]he Commission does not require a formalized agreement or official partnership structure to find coordination; an informal agreement has been found to be sufficient in prior matters." *Id.* at 13.

60.     *Second*, satisfied with the evidence that True the Vote's Georgia activities were coordinated with the Georgia GOP, OGC turned to whether those coordinated activities were "undertaken for the purpose of influencing the runoff election"—again answering in the affirmative. OGC Report at 17-18. OGC reasoned that True the Vote's coordinated activities were not only undertaken in partnership with the Georgia GOP—an entity "whose fundamental purpose is to help Republicans win elections in Georgia"—but were also evidently "motivated by 'what happened in November'" and instigated with the specific goal of "influenc[ing] the election by challenging absentee voter registrations." *Id.* at 17-18.

61.     Finally, OGC concluded that there was reason to believe the Georgia GOP had violated the disclosure requirements at 52 U.S.C. § 30104(b) and 11 C.F.R. § 104.3(a) and (b) because it had "failed to disclose any contribution or expenditure information in connection with

its self-described partnership with True the Vote, including the dates, amounts, and purposes of the in-kind contributions." OGC Report at 20. OGC further noted that the record "does not include how much money True the Vote expended in connection with its election integrity efforts in Georgia," *id.* at 21, and therefore proposed that its investigation should "focus first on determining the nature and extent to which True the Vote and the Georgia GOP coordinated True the Vote's activity, and request information to ascertain the costs associated with those efforts," *id.*

***The Commission Deadlocks on a Reason to Believe Finding and Dismisses the Complaint***

62.     On August 11, 2022, the Commission, by a deadlocked vote of 2-3 with one Commissioner recused, failed to approve OGC's reason-to-believe recommendations, falling short of the four affirmative votes needed to move forward. Certification at 1-2, MUR 7894 (Aug. 11, 2022), https://www.fec.gov/files/legal/murs/7894/7894_15.pdf.

63.     The Commission also failed, again on August 11 and by a deadlocked vote of 2-3, to reject OGC's recommendations and find no reason to believe with respect to all of the allegations. Certification at 2.

64.     Finally, likewise on August 11, the Commission voted by a 4-0 margin, with one recusal and one abstention, to "[c]lose the file," dismissing the matter. Certification at 2-3.

65.     Two of three Commissioners who voted against OGC's reason-to-believe recommendations subsequently issued a Statement of Reasons explaining the basis for their votes. *See* Dickerson & Trainor Statement, MUR 7894 (Sept. 13, 2022), https://www.fec.gov/files/legal/murs/7894/7894_20.pdf. The rationale for the dismissal, as provided in the "no-voting" Commissioners' Statement of Reasons, demonstrates that their votes rested on interpretations of FECA and agency precedent that are legally unsustainable, arbitrary and capricious, and otherwise contrary to law. *See Orloski*, 795 F.2d at 161.

66.     For example, the Commissioners posited that True the Vote's activities were not undertaken "for the purpose of influencing an election," but rather, for two purposes they described as categorically beyond the FEC's jurisdiction: "state law compliance" and "core issue advocacy." Dickerson & Trainor Statement at 8-9. In the view of these two Commissioners, True the Vote's activities fell "outside of the ambit of FECA" because (1) the activities assertedly targeted compliance with state election laws, and (2) "trying to influence how elections are administered, as a policy matter, is different from acting 'for the purpose of influencing' a federal election"— and amounts to protected issue advocacy that the Commissioners believed could not be regulated as a matter of constitutional law. *Id.* at 6.

67.     These Commissioners also determined, notwithstanding the extensive and unrebutted evidence to the contrary, that True the Vote's activities were not undertaken "in cooperation, consultation, or concert with, or at the request or suggestion of" the Georgia GOP. Dickerson & Trainor Statement at 9. After cautioning that finding reason to believe coordination has occurred requires "a concrete and plausible factual basis" and suggesting that the requisite factual basis was absent, the Commissioners summarily asserted that "[t]wo primary facts" foreclosed further investigation. *Id.* at 9-10. First, they noted that True the Vote's services "were equally available to all comers," without explaining how that was material to whether they coordinated with the Georgia GOP; and second, again in conclusory fashion, they posited that True the Vote would have undertaken the same activities regardless of the Georgia GOP's involvement. *Id.* They denied that the respondents' use of the term "partnership" suggested that they coordinated within the meaning of the Act, asserting without further explanation that the term "had a colloquial and not a legal significance." *Id.* at 10.

68.     FECA's contribution source limits and disclosure requirements are central to its core anticorruption and transparency purposes—and as the Supreme Court has long recognized, a coordinated expenditure has "virtually the same value . . . as a contribution and would pose similar dangers of abuse." *Buckley*, 424 U.S. at 46.

69.     Rather than employing the careful coordination analysis dictated by FECA and Commission precedent or engaging meaningfully with OGC's conclusions, however, the no-voting Commissioners summarily determined that they lacked the constitutional and statutory authority to regulate True the Vote's activities—which were avowedly undertaken at the "request" of and in "partnership" with the Georgia GOP to "assist" the party during a specifically identified federal election—as coordinated expenditures. Their votes thus rested on a coordination standard that flouts FECA's unambiguous mandate to regulate and require disclosure of all expenditures made "in cooperation, consultation, or concert, with, or at the request or suggestion of" a political party as in-kind contributions. 52 U.S.C. § 30116(a)(7)(B)(i).

70.     The Commissioners' cursory analysis also suggests it was little more than *post hoc* rationalization for arbitrary and results-oriented decisionmaking—a conclusion bolstered by the Commission's apparent general policy of non-enforcement in this area notwithstanding the clear statutory directive to regulate coordinated expenditures as contributions and subject them to the Act's limits, source restrictions, and disclosure requirements.[7]

71.     Accordingly, the dismissal of plaintiffs' administrative complaint was grounded on unsustainable conclusions of law and arbitrary decisionmaking, and manifestly "compromises the

---

[7] Since the 2010 decision in *Citizens United*, "the Commission has not once entered into pre-probable cause conciliation or found probable cause to believe that a respondent violated the coordination regulations." Statement of Reasons of Comm'r Ellen L. Weintraub, MUR 7146 (Sept. 20, 2019).

Act's purposes," *Orloski*, 795 F.2d at 164, by inviting "attempts to circumvent the Act through prearranged or coordinated expenditures amounting to disguised contributions." *Buckley*, 424 U.S. at 46-47.

## CAUSE OF ACTION

### *Dismissal Contrary to Law, 52 U.S.C. § 30109(a)(8)(A)*

72.     Plaintiffs repeat and reallege paragraphs 1-71 as if set forth fully herein.

73.     Common Cause's administrative complaint in MUR 7894 established reason to believe that (1) True the Vote violated 52 U.S.C. § 30118, 11 C.F.R. § 114.2(a), and 11 C.F.R. § 114.10 by making prohibited in-kind contributions to the Georgia GOP in the form of coordinated expenditures, and (2) the Georgia GOP violated 52 U.S.C. § 30118(a) by knowingly accepting these contributions, and 52 U.S.C. § 30104(b)(3)(A) by failing to report them as required by FECA.

74.     The Commission's failure to find reason to believe that these violations occurred and its subsequent dismissal of plaintiffs' administrative complaint were arbitrary, capricious, and contrary to law. *See* 52 U.S.C. § 30109(a)(8)(A); *Orloski*, 795 F.2d at 161.

## REQUESTED RELIEF

WHEREFORE, Plaintiffs requests that this Court:

(1) Declare that the FEC's dismissal of Plaintiffs' administrative complaint was arbitrary, capricious, and contrary to law under 52 U.S.C. § 30109(a)(8)(A);

(2) Order the FEC to conform with this declaration within thirty days pursuant to 52 U.S.C. § 30109(a)(8)(C);

(3) Award Plaintiffs their costs and reasonable attorney's fees incurred in this action; and

(4) Grant such other relief as the Court may deem just and proper.

Dated: October 10, 2022                      Respectfully submitted,

                                             /s/ Megan P. McAllen
                                             Megan P. McAllen (DC Bar No. 1020509)
                                             Erin Chlopak (DC Bar No. 496370)
                                             CAMPAIGN LEGAL CENTER ACTION
                                             1101 14TH ST. NW, SUITE 400
                                             WASHINGTON, D.C. 20005
                                             (202) 736-2200