**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

COMMON CAUSE GEORGIA, *et al.*,

        *Plaintiffs*,

v.

FEDERAL ELECTION COMMISSION,

        *Defendant*.

No. 22-cv-3067 (DLF)

<u>**MEMORANDUM OPINION**</u>

Common Cause Georgia and Treaunna C. Dennis, Common Cause Georgia's executive director (together, "Common Cause"), challenge the Federal Election Commission's dismissal of their administrative complaint against True the Vote and the Georgia Republican Party for alleged violations of the Federal Election Campaign Act ("FECA"). The parties have filed cross-motions for summary judgment. Dkts. 13, 14. For the reasons that follow, the Court will grant both motions in part and deny both motions in part.

**I.  BACKGROUND**

**A.  Statutory Background**

Federal law regulates how political parties raise and spend money. 52 U.S.C. §§ 30101–26; *SpeechNow.org v. FEC*, 599 F.3d 686, 691–92 (D.C. Cir. 2010). Among other things, FECA makes it "unlawful for . . . any corporation . . . to make a contribution [to a political party] . . . in connection with any election" for U.S. Senate. 52 U.S.C. § 30118(a). It also requires parties to publicly disclose their contributors "together with the date and amount of [their] contribution[s]." *Id.* § 30104(b)(3)(A).

"[C]ontribution" is a defined term.  It includes, with exceptions not relevant here, "[a]ny expenditure . . . made in cooperation, consultation, or concert with, or at the request or suggestion of . . . a political party" or "an agent thereof."  11 C.F.R. § 109.20 (so providing for FECA's disclosure provisions); *see id.* § 114.10(a) (applying this definition to FECA's corporate-contribution ban).[1]  "Expenditure" includes, again with exceptions not relevant here, "any purchase [or] payment . . . made by any person for the purpose of influencing any election for Federal office."  52 U.S.C. § 30101(9)(A)(i).

The Federal Election Commission enforces these rules.  *Id.* § 30106(b)(1).  "Any person who believes" that a donor or political party has violated them "may file a complaint with the Commission."  *Id.* § 30109(a)(1).  "If the Commission . . . determines, by an affirmative vote of 4 of its members, that it has reason to believe that a person has committed . . . a violation," it "shall make an investigation."  *Id.* § 30109(a)(2).  After investigating, "if the Commission determines . . . that there is probable cause to believe that any person has committed . . . a violation," a conciliation and enforcement process begins.  *Id.* § 30109(a)(4)(A)(i).

If the Commission dismisses a complaint instead of investigating it, the dismissal is subject to judicial review.  *Id.* § 30109(a)(8)(A).  "In any [such] proceeding . . . [a] court may declare that the dismissal of the complaint . . . is contrary to law, and may direct the Commission to conform with such declaration within 30 days."  *Id.* § 30109(a)(8)(C).

**B.    Factual Background & Procedural History**

Common Cause Georgia is a state office of Common Cause, a national organization that seeks to "rein in the power of big money in politics."  Common Cause, *Campaign Finance* (last

---

[1] Another section of FECA limits the contributions individuals can make to political parties, *see* 52 U.S.C. § 30116(a), but that section is not at issue in this case.

visited Aug. 3, 2023), https://perma.cc/YL46-8A96; *see, e.g.*, Decl. of Treaunna C. Dennis ¶ 11, Dkt. 13-1 ("Dennis Decl."). Treaunna C. Dennis leads Common Cause Georgia. Dennis Decl. ¶ 10. Dennis says that she "use[s] information from" FECA's mandatory disclosures "to assess candidates for elective office." *Id.* ¶ 5. She adds that "Common Cause Georgia relies on the accurate and complete recording of campaign finance information to carry out activities central to its mission, including public education and research about the true sources and scope of political campaign spending." *Id.* ¶ 12.

In 2021, Common Cause filed an administrative complaint with the Commission regarding the 2021 Georgia Senate runoff elections. Admin. Record (AR) at 1, Dkt. 19. The complaint focused on True the Vote, a nonprofit corporation devoted to "election integrity," and the Georgia Republican Party. *Id.* It alleged that True the Vote spent money on election-related activities, including "a voter hotline, ballot-curing support, signature verification training, [and] absentee ballot drop box monitoring," in coordination with the Party. AR 1–2. It also alleged that the Party had not disclosed its coordinated expenditures with True the Vote. AR 12. Based on these allegations, the complaint charged (1) that True the Vote made unlawful corporate contributions to the Party; (2) that the Party unlawfully accepted coordinated corporate contributions; and (3) that the Party fell short of its FECA disclosure obligations. AR 2.

The Commission evaluated whether it should commence an investigation. To aid in this inquiry, the Commission's general counsel prepared a nonbinding report finding reason to believe that the Party and True the Vote coordinated to influence the 2021 election and hence violated FECA. AR 56–77. The report relied on two kinds of evidence:

- True the Vote's documents suggested that the Party requested or suggested its participation in the Georgia runoff. In a public fundraising email, True the Vote said it received a "request from the Georgia Republican Party to provide publicly available nonpartisan signature verification training, a 24x7 vote hotline, ballot-curing support,

and more."   AR 59 (quoting True the Vote, *Weekly Update* (Dec. 14, 2020), https://perma.cc/2FZQ-DGKC).  And in a private email, a consultant wrote to one of True the Vote's donors: "Republicans now reaching out to ask if we will play in GA senate runoff."  AR 62 (quoting AR 201).

- Other evidence indicated that True the Vote's Georgia efforts took place in concert with the Party's.  A True the Vote press release announced a "partnership with the Georgia Republican Party to assist with the Senate runoff" and quoted a Party official as promising: "[t]he resources of True the Vote will help us to organize and implement the most comprehensive ballot security initiative in Georgia history."  AR 60 (quoting True the Vote, *True the Vote Partners with Georgia GOP to Ensure Transparent, Secure Ballot Efforts for Senate Runoff Elections* (Dec. 14, 2020), https://perma.cc/3CPP-3CHV).   Three days later, True the Vote "challenged the eligibility of 364,541 registered Georgia voters."  *Id.*  It thanked "several Georgia residents for their assistance" in lodging the challenges, including two Georgians with connections to the Party.  AR 61.

The report also found reason to believe that True the Vote acted "for the purpose of influencing an election."  AR 72 (capitalization altered).  It reasoned that "True the Vote's efforts were undertaken in partnership with the Georgia GOP, a committee whose fundamental purpose is to help Republicans win elections in Georgia."  *Id.*  It observed that, after the 2020 Presidential election, a crucial donor funded True the Vote in order to "win [the election for President Trump] by eliminating votes and changing the count."  AR 73 n.62 (quoting AR 165).  And it quoted documents in which True the Vote's founder discussed her work's partisan valence. "Most . . . illegal votes," she said, "are being counted in Democrat counties and are suppressing legitimate results."  AR 73 n.61 (quoting AR 142, discussing the 2020 election).

Alongside the report, the Commission considered statements from True the Vote and the Georgia Republican Party.  True the Vote's President, Catherine Engelbrecht, described her organization as "non-partisan" and pledged that it "[did] not have an interest in which candidates [were] elected."  AR 46.  She acknowledged meeting with the Georgia Republican Party to "discuss[] [her] efforts promoting election integrity" but claimed that she "did not communicate

4

again with [the Party] after that initial meeting."  AR 47.  True the Vote and the Party "did not have any substantial discussions . . . about their election integrity efforts," she added, and "[t]he 'partnership' mentioned in [her] press release" did not use "the word 'partner' in an official sense." AR 47–48.  The Republican Party's submission mirrored True the Vote's.  AR 52–55.

By a 3-2 vote, with one Commissioner recused, the Commission failed to act on Common Cause's complaint.  Two of the three Commissioners in the majority (the "Controlling Commissioners") issued a Statement of Reasons explaining their decision.[2]  AR 277–87. According to the Statement, True the Vote had not coordinated with the Party because its "election integrity initiatives were equally available to all comers" and because it "would have" participated in the Georgia runoff "*regardless* of Engelbrecht's meeting with the Georgia GOP."  AR 285.  In the alternative, True the Vote had not sought to influence a Federal election.  Instead, it aimed only "to influence how elections are administered, as a policy matter."  AR 282.  Plus, "state law compliance [was] categorically excluded from the Commission's enforcement jurisdiction."  AR 281.

Common Cause sought review in this Court.  Dkt. 1.  Before the Court are the parties' cross-motions for summary judgment.  Dkts. 13, 14.

## II.   LEGAL STANDARD

A party is entitled to summary judgment when "there is no genuine dispute as to any material fact and the [party] is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see*

---

[2] Under D.C. Circuit precedent, "if the [Commission] fails to muster four votes in favor of initiating an enforcement proceeding, the Commissioners who voted against taking that action"—known as "Controlling Commissioners"—must "issue a statement explaining their votes." *Citizens for Resp. & Ethics in Wash. v. FEC*, 892 F.3d 434, 437 (D.C. Cir. 2018). "[F]or purposes of judicial review, the statement or statements of those naysayers . . . will be treated as if they were expressing the Commission's rationale for dismissal." *Id.*; *see Common Cause v. FEC*, 842 F.2d 436, 449 (D.C. Cir. 1988).

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  When the Commission dismisses an administrative complaint, "[t]he 'entire case' on review is a question of law."  *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001); *see Campaign Legal Ctr. & Democracy 21 v. FEC*, 952 F.3d 352, 357 (D.C. Cir. 2020).  The reviewing court asks whether the Commission "dismissed the complaint as a result of an impermissible interpretation of the Act" or whether its dismissal, "under a permissible interpretation of the statute . . . was arbitrary or capricious, or an abuse of discretion."  *Orloski v. FEC*, 795 F.2d 156, 161 (D.C. Cir. 1986); *see also* 52 U.S.C. § 30109(a)(8)(C).

The parties agree that arbitrary-and-capricious review under FECA mirrors arbitrary-and-capricious review under the Administrative Procedure Act.  Pls.' Mem. in Support of Summ. J. at 16, Dkt. 13; Def.'s Mem. in Support of Summ. J. at 20, Dkt. 14 (both citing *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29 (1983)); *accord Campaign Legal Ctr. v. FEC*, No. 19-cv-2336, 2022 WL 17496220, at *4 (D.D.C. Dec. 8, 2022).  Under that standard, the Court asks whether the Commission "'relied on factors that Congress ha[d] not intended it to consider, entirely failed to consider an important aspect of the problem'" before it, or "'offered an explanation' for its decision 'that runs counter to the evidence'" in the record.  *Friends of Animals v. Ross*, 396 F. Supp. 3d 1, 7 (D.D.C. 2019) (quoting *Agape Church v. FCC*, 738 F.3d 397, 410 (D.C. Cir. 2013)); *see State Farm*, 463 U.S. at 43.

## III.  STANDING

Before reaching the merits of Common Cause's challenge, the Court must satisfy itself that Common Cause has standing.[3]  *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95

---

[3] "To establish jurisdiction, the [Court] need only find one plaintiff who has standing."  *Mendoza v. Perez*, 754 F.3d 1002, 1010 (D.C. Cir. 2014).  Here, Dennis' interests are aligned with the

(1998).   Standing requires (1) an injury in fact (2) that is traceable to a defendant's challenged

conduct (3) and that a favorable decision would "likely" redress.  *Lujan v. Defs. of Wildlife*, 504

U.S. 555, 560–61 (1992).  "'[A] plaintiff must demonstrate standing for each claim he seeks to

press' and 'for each form of relief' that is sought."  *Davis v. FEC*, 554 U.S. 724, 734 (2008)

(quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006)).   To survive a motion for

summary judgment, a plaintiff must provide "specific facts" supporting "each element" of standing

for each of her claims.  *Lujan*, 504 U.S. at 561 (quoting Fed. R. Civ. P. 56(e)).

   Common Cause challenges three actions taken by the Commission: the Commission's

failure to find reason to believe that the Georgia Republican Party violated FECA's disclosure

provisions, its failure to find reason to believe that True the Vote made an unlawful corporate

contribution to the Party, and its failure to find reason to believe that the Party knowingly received

an unlawful corporate contribution from True the Vote. [4]   AR 268–69; Compl. ¶¶ 30–41.   The

---

interests of Common Cause Georgia.  As a result, the Court's standing analysis does not
materially differ with respect to either plaintiff.

[4] Although Common Cause argues that it asserts a "single cause of action against the FEC," Pls.'
Combined Reply & Opp. at 5–6, Dkt. 16, its complaint asks this Court to find that three discrete
agency actions were unlawful.  *See* Compl. ¶¶ 73–74, Dkt. 1 (contending that "Common Cause's
administrative complaint . . . established reason to believe" (1) that True the Vote made
"prohibited [corporate] . . . contributions," (2) that "the Georgia GOP . . . knowingly accept[ed]
these contributions," and (3) that the Georgia GOP "fail[ed] to report them as required," and
adding that "the Commission's failure to find reason to believe that these *violations*"—plural—
"occurred" was unlawful) (emphasis added); AR 268–69 (describing the Commission's separate,
formal "actions" as to Common Cause's complaint).

Even assuming that each agency action was unlawful for the same reason, *see* Pls' Reply at 2, 5,
a party "must prove separate standing as to each agency action challenged."  *Sec. Indus. & Fin.
Mkts. Ass'n v. CFTC*, 67 F. Supp. 3d 373, 400 (D.D.C. 2014) (citing *Am. Trucking Ass'ns v. Fed.
Motor Carrier Safety Admin.*, 724 F.3d 243, 248 (D.C. Cir. 2013)); *Cuno*, 547 U.S. at 351–52
(holding that "a plaintiff must demonstrate standing for each claim he seeks to press" and
rejecting argument that factual and/or legal overlap between claims can generate standing "over
a claim that does not itself satisfy" Article III's standing requirements).  The Court must
therefore determine whether Common Cause has standing to challenge each Commission action

Court finds that Common Cause has standing to challenge the Commission's first action, related to FECA's disclosure rules, but not the second and third actions, involving the making and receipt of unlawful corporate contributions.

### A.     Disclosure Determination

As the Commission concedes, *see* Def.'s Mem. in Support of Mot. for Summ. J. at 14, Common Cause has standing to challenge the Commission's failure to investigate its disclosure claim.  By refusing to reveal the dollar value of True the Vote's Georgia activities, information that (Common Cause alleges) FECA "requires . . . be publicly disclosed," the Commission has "den[ied]" Common Cause access to information that would "help [its] efforts" to reduce money's influence in politics.[5]  *Campaign Legal Ctr.*, 952 F.3d at 356.  That counts as an injury in fact.  *Id.*; *see FEC v. Akins*, 524 U.S. 11, 24–25 (1998).  Common Cause's injury is "'fairly traceable' to the Commission's dismissal[] of [its] complaint" because the Party would have been required to make corrective disclosures had the Commission found its conduct unlawful.  *Campaign Legal Ctr.*, 952 F.3d at 356 (quoting *Lujan*, 504 U.S. at 560); *see Akins*, 524 U.S. at 25.  Finally, "it is likely that the injury [would] be 'redressed by a favorable decision' of this [C]ourt."  *Campaign Legal Ctr.*, 952 F.3d at 356 (quoting *Lujan*, 504 U.S. at 561).  On remand from this Court, the Commission could order such disclosures from the Georgia Republican Party, and the information ordered to be disclosed would further Common Cause's election-related efforts.

---

separately.  *AB PAC v. FEC*, No. 22-2139, 2023 WL 4560803, at *2–3 (D.D.C. Jul. 17, 2023) (reaching same conclusion in challenge to FEC decision).

[5] "[I]n reviewing the standing question, the [C]ourt must . . . assume that on the merits the plaintiffs would be successful in their claims."  *City of Waukesha v. EPA*, 320 F.3d 228, 235 (D.C. Cir. 2003).

### B.       Corporate-Contribution Determinations

That said, Common Cause lacks standing to challenge the Commission's failure to investigate its corporate-contribution claims.  Unlike its dismissal of Common Cause's disclosure claim, the Commission's dismissal of Common Cause's corporate contribution claims did not deprive Common Cause of any information; Common Cause lacked information about True the Vote's corporate contributions because the Party did not *disclose* them to the Commission, not because they were substantively illegal.[6]   And although Common Cause says that the Commission's failure to act on its corporate-contribution claims injured it in another way—by hindering Common Cause's "efforts to 'protect and expand voting rights'" in the 2021 runoff and thereafter, Pls.' Combined Reply & Opp. at 12, Dkt. 16 (quoting Dennis Decl. ¶ 13)—these injuries do not give Common Cause standing either.

To the extent that Common Cause contends that it suffered injuries during the 2021 Georgia runoff itself, those injuries are not "redressable by a favorable decision of this Court."  *Lujan*, 504 U.S. at 561.  2021 has come and gone, meaning that damages or other compensatory relief would be necessary to redress Common Cause's runoff-related injuries.  *See City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983).   But FECA does not authorize the Commission to award damages or other compensatory relief, *see* 52 U.S.C. § 30109(a)(4)–(6), and Common Cause has not sought backwards-looking remedies in this case, Compl. at 22.  Because the Commission cannot "reverse" or even ameliorate "the . . . harms" Common Cause "suffered" in 2021, those harms do not give Common Cause standing now.  *Nader v. FEC*, 725 F.3d 226, 229 (D.D.C. 2013) (declining to find standing based on past injuries in FECA case).

---

[6] Putting the point differently, Common Cause's informational injuries are traceable to the Commission's dismissal of its disclosure claims rather than its corporate-contribution claims. *See Lujan*, 504 U.S. at 560 (discussing traceability).

Meanwhile, although Common Cause also argues that True the Vote's activities will *continue* to obstruct its efforts in the future, that risk is sufficiently attenuated that it cannot support standing either. *See Lujan*, 504 U.S. at 561 (requiring injury to be "likely"); *Clapper v. Amnesty Int'l, USA*, 568 U.S. 398, 414 (2013) (requiring future injury to be "certainly impending"). Granted, an order setting aside the Commission's dismissal of Common Cause's administrative complaint might block True the Vote from coordinating with the Party—and thereby obstructing Common Cause—in future elections. *Cf.* Pls.' Combined Reply & Opp. at 12. But the record does not show that True the Vote is likely to coordinate with the Party in the future, regardless of what the Commission does.[7] So too, while Commission proceedings against True the Vote might deter coordination between the Party and *other* outside groups, the record before the Court makes that possibility no more than "speculative" at this juncture. *See Friends of the Earth, Inc. v. Laidlaw Env. Servs. (TOC), Inc.*, 528 U.S. 167, 187 (2000).

It does not matter that, "[t]o counteract . . . the Commission's failure to enforce FECA's prohibitions on corporate contributions . . . against True the Vote," Common Cause has "hir[ed] a contractor to work on voter protection efforts." Dennis Decl. ¶ 13. Common Cause "cannot manufacture standing" by incurring costs "based on [its] fears of hypothetical future harm." *Clapper*, 468 U.S. at 416. In a similar vein, it does not matter whether the Commission's rationale for dismissing Common Cause's complaint "creat[ed] 'a roadmap' for [True the Vote] and others to collaborate" in ways that could frustrate Common Cause's future interests. Pls.' Combined Reply & Opp. at 12 (quoting Dennis Decl. ¶ 13). Although an opinion from this Court might benefit Common Cause in future litigation, "[i]t is a federal court's judgment, not its opinion, that

---

[7] For that matter, the record contains no evidence that True the Vote—a small organization focused largely on contesting the 2020 election—will participate in future elections at all.

remedies an injury." *Haaland v. Brackeen*, 143 S. Ct. 1609, 1639 (2023).  Common Cause does not explain how a judgment reinstating its corporate-contribution complaints would further Common Cause's mission, and the record makes that possibility "speculative" at best. *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 42 (1976).

For these reasons, the Court finds that Common Cause has standing to challenge the Commission's dismissal of its claim that the Republican Party failed to discharge its FECA reporting obligations.  AR 268.  But it lacks standing to challenge the Commission's dismissal of its remaining corporate-contribution claims.   AR 268–69.   The Court will therefore dismiss Common Cause's challenge to the denial of its corporate-contribution claims.

## IV.   MERITS

Turning to the merits, Common Cause challenges the FEC's dismissal of its administrative complaint, which alleged that the Georgia Republican Party failed to disclose its coordinated expenditures with True the Vote.  AR 12.   To trigger a Commission investigation, Common Cause needed to show only that the Commission had "reason to believe" (1) that True the Vote coordinated its activities with the Republican Party (2) for the purpose of influencing a federal election.   11 C.F.R. § 109.20; 52 U.S.C. §§ 30101(9)(A)(i), 30109(a)(2).   Before this Court, Common Cause must show that the Commission's failure to find reason to believe was arbitrary, capricious, or an abuse of discretion.  *Orloski*, 795 F.2d at 161.

"[T]he reason-to-believe" standard sets a "low bar."  *Campaign Legal Ctr.*, 2022 WL 17496220 at *8.   In this context, it requires no more than a "credible allegation that coordinated activity yielded an impermissible contribution."[8] *Id.* (cleaned up).   Still, speculation is not enough.

---

[8] FECA provides that, *after* the Commission finds reason to believe that a complaint has merit and conducts an investigation, it must decide whether "there is probable cause to believe that any person has committed . . .  a violation" of FECA.  52 U.S.C. § 30109(a)(4)(A)(i).  The natural

As the Controlling Commissioners put the point, "[t]he Commission . . . require[s] a concrete and plausible factual basis for finding reason to believe that coordination has occurred."  AR 285.

The Controlling Commissioners declined to investigate Common Cause's complaint, finding insufficient reason to believe that (1) True the Vote coordinated with the Party or that it (2) acted to influence a federal election.  Neither justification withstands scrutiny, even affording the Commission due deference.[9]  As a result, the Commission's failure to act on Common Cause's disclosure claim was "contrary to law."  *Orloski*, 795 F.2d at 161.

### A.   Coordination

FECA requires disclosure of "[a]ny expenditure . . . made in cooperation, consultation, or concert with, or at the request or suggestion of . . . a political party."  11 C.F.R. § 109.20. The evidence before the Commission gave it plentiful reason to believe that True the Vote acted in cooperation with, or at the request or suggestion of, the Georgia Republican Party. The Controlling Commissioners' contrary determination was arbitrary and capricious.

---

inference is that the standard for finding reason to believe is less than the standard for finding probable cause.  *Campaign Legal Ctr.*, 2022 WL 17496220 at *8; *cf. Kaley v. United States*, 571 U.S. 320, 338 (2014) ("[P]robable cause . . . is not a high bar.").  That said, the Court's analysis does not depend on the precise relationship between reason-to-believe and probable cause under FECA.

[9] The parties disagree over whether the Commission's Statement of Reasons' legal analysis merits deference under *Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837 (1984).  *Compare* Pls.' Mem. in Support of Summ. J. at 17 ("The controlling Commissioners' legal interpretations . . . are not entitled to the added boost of *Chevron* . . . deference."), *with* Def.'s Mem. In Support of Summ. J. at 22 (arguing otherwise).  The Court need not decide this issue because even affording the Commission full deference, the Court finds that the Commission acted unreasonably in dismissing Common Cause's administrative complaint because the Commission had ample "reason to believe," 52 U.S.C. § 30109(a)(2), that the Republican Party and True the Vote coordinated to influence the 2021 election, and thus violated FECA.

Read in context, True the Vote's public statements gave the Commission clear reasons to believe that it coordinated with, or acted at the request or suggestion of, the Georgia Republican Party during the 2021 runoff.  Start with True the Vote's public statements, which all but admitted coordination.   In a fundraising email, True the Vote described a "request from the Georgia Republican Party" to participate in the runoff election.  AR 59 (quoting True the Vote, *Weekly Update* (Dec. 14, 2020), https://perma.cc/2FZQ-DGKC).  Later, in a press release, True the Vote "announc[ed]" its participation in "partnership with the Georgia GOP."  AR 60 (quoting True the Vote, *True the Vote Partners with Georgia GOP to Ensure Transparent, Secure Ballot Efforts for Senate Runoff Elections* (Dec. 14, 2020), https://perma.cc/3CPP-3CHV.  Those public statements gave the Commission "a concrete and plausible factual basis," AR 285, for thinking that True the Vote participated in the runoff in partnership with or at the request of the Party.

The context of True the Vote's comments made the nature of its activities even clearer.  In private emails, a consultant told one of True the Vote's donors that "Republicans" had "reach[ed] out to ask if we will play" in the Georgia runoff election.  AR 62 n.14 (quoting AR 201).  And when True the Vote challenged more than 300,000 Georgians' eligibility to vote in the runup to Election Day, it partnered with two Republicans with close ties to the Georgia Republican Party— one the former chairman of Georgia's Jackson County Republican Party, the other a 2020 delegate to the Republican National Convention and the 2021 chairman of the Georgia Republican Party for the Tenth Congressional District—who served as official ballot "challengers" under Georgia law.  AR 61, 71. All this made it even more plausible that True the Vote participated in the runoff "in cooperation, consultation, or concert with, or at the request or suggestion of," the Georgia Republican Party.  11 C.F.R. § 109.20.

The Controlling Commissioners saw things differently, but their Statement of Reasons was factually and legally unreasonable. *Cf. Constellation Mystic Power, LLC v. FERC*, 45 F.4th 1028, 1043 (D.C. Cir. 2022) ("[D]eference does not mean carte blanche, and the Commission must at all times demonstrate the markers of 'principled and reasoned decisionmaking supported by the evidentiary record.'" (cleaned up)).  The Controlling Commissioners claimed that True the Vote never coordinated with the Party because its "election integrity initiatives were equally available to all comers."  AR 285.  But that is not the test.  It is clear that an organization can spend money "in cooperation" with or "at the request or suggestion of" a political party, 11 C.F.R. § 109.20, even if its spending aids multiple political parties or the general public.[10]

The Controlling Commissioners also discounted True the Vote's reference to a "partnership" between it and the Georgia Republican Party, reasoning that True the Vote's public statements used "partnership" in a "colloquial and not a legal" sense.  AR 286.  Regardless, the word "partnership" was not the only evidence suggesting that True the Vote and the Republican Party engaged in concerted action.  As explained above, True the Vote's voter challenges leaned on Georgians with close connections with the Republican Party; "Republicans" "reach[ed] out" to at least one True the Vote donor to assess whether he might "play" in the Georgia runoff; and another True the Vote email described a "request" from the Republican Party for True the Vote's runoff participation.  AR 60–61.  Even affording the Controlling Commissioners ample room for reasonable disagreement, these facts left them no room to conclude that the Commission lacked reason to believe that True the Vote and the Georgia Republican Party coordinated.

---

[10] For example, suppose that a donor produces and pays for campaign advertising for every Congressional candidate in her district.  Such expenditures count as "coordinated," *see* 11 C.F.R. § 109.21(d), even though they benefit members of more than one political party.  Indeed, important campaign donors "often [make] substantial contributions to both" major political parties.  *See McConnell v. FEC*, 540 U.S. 93, 124 & n.12 (2003).

Finally, the Controlling Commissioners concluded that True the Vote did not act "in cooperation with" or "at the request of" the Party because it "[was] pursuing [its] initiatives . . . and would have continued to do so *regardless* of [any] meeting with the Georgia GOP."  AR 285.  But this justification for True the Vote's behavior fails for legal and factual reasons.  Legally, FECA covers expenditures made "in cooperation with" or "at the request of" a political party.  11 C.F.R. § 109.20.  Notwithstanding the Commission's interpretation, it is not obvious that this language can be read to require a but-for causal link between a request for assistance and an expenditure, and the Supreme Court's cases dealing with coordinated expenditures have never suggested that it does.  *See, e.g.*, *Buckley v. Valeo*, 424 U.S. 1, 46 n.53 (1976) (per curiam); *Colo. Republican Fed. Campaign Committee v. FEC*, 518 U.S. 604, 614 (1995) (plurality op.); *FEC v. Colo. Republican Fed. Campaign Committee*, 533 U.S. 431, 442–43 (2001).  At any rate, the Statement of Reasons does not explain why FECA links causation with coordination, and the Court cannot affirm the Controlling Commissioners' decision based on legal analysis they did not advance in the Commission's administrative proceedings.  *SEC v. Chenery Corp.*, 318 U.S. 80, 92 (1943).

More importantly, even assuming that the Controlling Commissioners interpreted FECA and its implementing regulations correctly, the record gave the Commission ample reasons to believe that the Republican Party's encouragement was a but-for cause of True the Vote's participation in the Georgia runoff.  If the Party had not "request[ed]" True the Vote's presence in Georgia, local Republicans might not have cooperated with True the Vote's voter eligibility challenges.  *Cf.* AR 59.  If Republicans had not "reach[ed] out" to see if True the Vote's donors might "play" in the runoff, True the Vote might have spent its time and money elsewhere.  AR 62 (quoting AR 201).  And so on and so forth.  In ignoring this "credible" evidence "that coordinated activity yielded an

impermissible contribution," the Controlling Commissioners acted unreasonably and unlawfully. *Campaign Legal Ctr.*, 2022 WL 17496220, at *8.

*State Farm* confines agencies to a "zone of reasonableness." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1155 (2021). The Controlling Commissioners' conclusion as to coordination—their finding that the Commission lacked reason to believe that True the Vote and the Georgia Republican Party coordinated—fell outside that zone. As a result, it was arbitrary and capricious.

### B.    Purpose

The Controlling Commissioners also held that, even if True the Vote coordinated with the Republican Party, it did not act to influence a federal election. AR 259. They offered two reasons why: (1) True the Vote sought to change "how elections are administered, as a policy matter," not to change the results of a federal election; and (2) anti-voter-fraud efforts like True the Vote's fell categorically outside the Commission's sphere of authority. Neither reason survives arbitrary-and-capricious review.

#### 1.    *Influence on Election Administration*

FECA regulates expenditures made "for the purpose of influencing" a federal election. 52 U.S.C. § 30101(9)(A)(i).[11] "Influencing" means "affecting" or "altering." *See, e.g.*, Influencing, Webster's New Int'l Dictionary (2d ed. 1942). Thus, expenditures seek to influence an election when they aim to affect or alter its result—for instance, when they target "the election or defeat of

---

[11] In the corporate-contribution context, as Common Cause observes, FECA regulates gifts of "anything of value . . . *in connection with* any election." 52 U.S.C. § 30118(a), (b)(2) (emphasis added); Pls.' Mem. in Support of Mot. for Summ. J. at 26. But Common Cause's corporate-contribution claim is no longer before the Court, as Common Cause lacks standing to pursue it.

a clearly identified [political] candidate." *See, e.g.*, *Buckley v. Valeo*, 424 U.S. 1, 80 (1976) (per curiam) (discussing electioneering communications).[12]

Here, the Commission had compelling reason to believe that True the Vote sought to alter or affect the result of the 2021 Georgia runoff. True the Vote "partnered" with the Georgia Republican Party, an entity "whose fundamental purpose is to help Republicans win elections," in pursuing its election-related aims in Georgia. *See* AR 72. And in discussing the 2020 Presidential election, True the Vote's leadership emphasized that "[m]ost . . . illegal votes" were "counted in Democrat counties" and "suppress[ed] legitimate results." AR 73 n.61. At least one of its donors was more candid still, describing efforts—in the aftermath of the 2020 election—to "win [the election for President Trump] by eliminating votes and changing the count." AR 73 n.62. This evidence provides compelling reasons to believe that True the Vote participated in the Georgia runoff election to help elect Republicans rather than Democrats. At minimum, it was unreasonable for the Controlling Commissioners to take the position that they lacked a "concrete and plausible factual basis" for investigating the question further. AR 285.

The Commission argues that True the Vote aimed to influence not the *results* of the runoff election, but "*how* elections" in Georgia "[were] administered." AR 282 (emphasis added). But

---

[12] The parties disagree over the extent to which *Buckley* constrains § 30101(9)(A)(i)'s scope. *Buckley* held that independent electioneering communications—e.g., advertisements produced without assistance from a candidate but aired during an election cycle—seek to influence a federal election *only* when they "expressly advocate" for the election or defeat of a particular political candidate. *Buckley*, 424 U.S. at 80; *see FEC v. Mass. Citizens for Life, Inc.*, 478 U.S. 238, 249–50 (1986). The parties disagree over whether this holding applies equally to coordinated contributions meant to fund *non-communicative* activities, like True the Vote's efforts to suppress voter fraud. *Compare* Pls.' Mem. in Support of Mot. for Summ. J. at 29–31 (arguing that a broader construction applies in this context), *with* Def.'s Mem. in Support of Mot. for Summ. J. at 31–35. The Court need not resolve this dispute. At minimum, § 30101(9)(A)(i) unambiguously reaches contributions made to ensure that one candidate wins and another candidate loses an election. As explained, the Court concludes that there is at least reason to believe that True the Vote made such contributions.

the Controlling Commissioners did not explain why the record supported this conclusion, and the weight of the evidence cuts sharply in a different direction.  Even affording the Commission's factfinding deference, its conclusion that True the Vote aimed only to influence "how elections . . . are administered" ran "counter to the evidence" before it.[13]  *State Farm*, 463 U.S. at 56.

The Commission adds that, like True the Vote, many nonprofits seek to alter State approaches to election administration without attempting to influence federal elections.  AR 283 (discussing advocacy groups' challenges to "mail-in ballot requirements, congressional redistricting plans . . . and numerous other election-related laws and practices").  But those nonprofits, unlike True the Vote, do not typically "partner" with political parties or focus on the outcome of particular elections; rather, they deal mostly with generally applicable rules of election administration.  In addition, the emails of these nonprofits' managers and affiliates do not typically reveal an interest in how "Democrat" counties count ballots or in "win[ning]" elections "by changing the count."  *Cf.* AR 283 & nn. 47–49 (describing, among other things, redistricting litigation).  By ignoring this important evidence, the Controlling Commissioners acted unreasonably and unlawfully.

Finally, the First Amendment cannot salvage the Controlling Commissioners' reasoning.  *Contra* Def.'s Mem. in Support of Mot. for Summ. J. at 24–26.  Rules requiring disclosure of coordinated expenditures comport with the First Amendment, at least in ordinary circumstances.

---

[13] In its briefing before this Court, the Commission argues that "the existence of *bona fide* reasons for the actions of a non-partisan organization that are central to its purpose . . . constitutes strong evidence that the organization [does not act] 'for the purpose of influencing a federal election.'"  Def.'s Mem. in Support of Mot. for Sum. J. at 34.  But the Controlling Commissioners did not articulate their reasoning in this way in their Statement of Reasons, making it unclear whether the Court can affirm their dismissal of Common Cause's complaint on this basis.  *See Chenery*, 318 U.S. at 92.

*Citizens United*, 558 U.S. at 367; *cf. Am. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2385–86 (2021).  At any rate, whatever the force of the Controlling Commissioners' First Amendment concerns as a general matter, they did not license the Controlling Commissioners to make factual findings at odds with the record in this case.

For these reasons, the Controlling Commissioners' conclusion that True the Vote sought only to influence "how elections are administered . . . as a policy matter" was arbitrary and capricious.  AR 282; *see State Farm*, 463 U.S. at 56.

2.      *"State Law Compliance"*

The Controlling Commissioners also reasoned that "state law compliance is categorically excluded from the Commission's enforcement jurisdiction."  AR 281.  Because True the Vote's "activities targeted compliance with valid Georgia laws governing" voter eligibility and voter fraud, according to the Commissioners, it followed that "the Commission [had] no authority to police" them.  AR 282.  The Court rejects this position.  Even according due deference to the Commission, the Commission's contention that FECA does not cover coordinated expenditures relating to state-law compliance was unreasonable and thus unlawful.

FECA's text unambiguously covers expenditures relating to voter fraud and/or state-law compliance.  Under FECA, expenditures involve "purchase[s] [or] payment[s] . . . for the purpose of influencing any election for Federal office."  52 U.S.C. § 30101(9)(A)(i).  That language covers *every* attempt to influence a federal election, whether by policing compliance with state law or otherwise.  Whatever the Commission's authority to interpret ambiguous statutes, "it does not include a power to revise clear statutory terms."  *Utility Air Reg. Grp. v. EPA*, 573 U.S. 302, 327 (2014).

Context confirms what FECA's plain text establishes.  When FECA carves out exceptions to § 30101(9)(A)(i)'s definition of "expenditure," it does so expressly.  Expenditures, for example, do not include "nonpartisan activity designed to encourage individuals to vote."  52 U.S.C. § 30101(9)(B)(ii).  Nor do they include news stories, payments for yard signs, or certain "compensation for legal or accounting services."  *Id.* § 30101(9)(B)(i), (viii), (vii).  The natural inference from this extensive list—a list that does not mention "state-law compliance" activities— is that such activities fall within FECA's regulatory perimeter.  *Cf. Nasdaq Stock Market LLC v. SEC*, 38 F.4th 1126, 1137 (D.C. Cir. 2022) (relying on *expressio unius* canon in finding that statute was not ambiguous).

Last but not least, a "state law compliance" exception for FECA would make little practical sense.  Many campaign contributions fund state-law compliance activities and yet obviously fall within the Commission's regulatory authority.  Campaigns, for example, can spend millions of dollars on legal fees.  Much of that money aims to ensure that a campaign, its competitors, and a state's election-administration officials comply with state law.  And yet contributions earmarked for a campaign's legal fees obviously fall within the Commission's authority to regulate. *See generally FEC v. Craig for U.S. Senate*, 816 F.3d 829, 834–39 (D.C. Cir. 2016) (discussing FEC regulations governing campaign legal expenditures).

The Controlling Commissioners reasoned that FECA "supersede[s] and preempt[s]" state laws within its scope, that it does *not* "supersede [s]tate laws which provide for the . . . prohibition of false registration, voting fraud, theft of ballots, and similar offenses," and thus that FECA does not cover activities "target[ing] compliance with valid [State] laws."  AR 282; 11 C.F.R. § 108.7(c)(4).  But the conclusion does not follow from the premises, for a statute can regulate or preempt attempts to "target[] compliance" with State laws without "supersed[ing]" those "laws"

themselves.  11 C.F.R. § 108.7(c)(4).  By analogy, FECA "does not supersede State laws which provide for . . . [v]oter registration."  11 C.F.R. § 108.7(c)(3).  But it undoubtedly regulates *how* candidates register voters or challenge voters' registration, for example, by limiting the circumstances in which donors can fund voter-registration drives.  *See* 52 U.S.C. § 30101(9)(B)(i).  So too here.  Even if FECA leaves state laws targeting false registration or voter fraud where it finds them, it *does* regulate coordinated expenditures meant to help campaigns ensure compliance with those laws.

Nor, once again, does the First Amendment shield the Controlling Commissioners' decision.  As the Court has previously explained, the disclosure components of Common Cause's administrative complaint did not raise serious constitutional questions.  *Cf. Perez v. Kipp DC Supporting Corp.*, 70 F.4th 570, 573 (D.C. Cir. 2023) (constitutional concerns must be "exceedingly real" to trigger principles of constitutional avoidance).  And independently, "[t]he canon of constitutional avoidance comes into play only when, after the application of ordinary textual analysis, [a] statute is found to be susceptible of more than one construction."  *Clark v. Martinez*, 543 U.S. 371, 385 (2005).  Here, regardless of the merits of the Controlling Commissioners' constitutional concerns, FECA is not genuinely open to the construction the Controlling Commissioners adopted.

In sum, the Controlling Commissioners acted unreasonably in finding that True the Vote did not seek to "influence a federal election."

## V.    CONCLUSION

For the foregoing reasons, the Court grants Common Cause's motion for summary judgment as to its disclosure claim, denies its motion for summary judgment as to its corporate-contribution claims, and dismisses Common Cause's action insofar as it seeks relief for the Commission's failure to investigate its corporate-contribution claims.  It grants the Commission's motion for summary judgment as to the corporate-contribution claims and denies the motion as to the disclosure claim.  A separate order consistent with this decision accompanies this memorandum opinion.

September 29, 2023

DABNEY L. FRIEDRICH
United States District Judge